UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAS GAIGALAS,

        Plaintiff,        FILE NO. 1:06-CV-105

v.        HON. ROBERT HOLMES BELL

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

        Defendant.
_____/

## OPINION

Plaintiff Kas Gaigalas filed the instant action alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Michigan Elliot Larsen Civil Rights Act ("ELCRA"), MICH. COMP. LAWS § 37.2101 *et seq.* The matter presently is before the Court on a motion for summary judgment filed by Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") (Docket #19). For the reasons that follow, the motion is **denied**.

### I.

The following facts are taken from the complaint in the light most favorable to Plaintiff.

Kas Gaigalas was a sales representative for BIPI from 1997 through March 2005. During his time with BIPI, Gaigalas was promoted from Professional Sales Representative I

("PSI I") to Professional Sales Representative II ("PSI II") and, in August 2003, to Senior Sales Representative. He was the only salesperson in his district to attain the level of Senior Sales Representative. Attainment of Senior Sales Representative requires demonstration of the highest level of performance in the eleven core competencies under evaluation.

Sales representatives were included in the BIPI "President's Club." Rankings in the President's Club were used to measure success. In 1998, Gaigalas was 15th in the nation in the President's Club. In 1999, he was number two in his region for sales and was praised for mentoring his fellow sales people. In 2000, 2001 and 2002, Gaigalas again had high sales. In fact, in 2001, he was the company's number one sales representative in the nation. (Senior Sales Promotion Documents, Pl. Ex. E.) While evaluations were completed based on all of the core competencies, sales representatives were paid based on their rankings and sales of targeted pharmaceuticals. (Gaigalas dep. at 33-34, 191-92.)

Gaigalas' annual reviews through and including 2003, the last of which was completed in March 2004, consistently showed him meeting or exceeding expectations in most areas of performance. (Pl. Ex. C.) Comments indicated that Gaigalas was respected for his teamwork, product understanding, rapport with physicians and commitment. He was asked by management to assist fellow sales representatives and to teach various sales seminars for the company. (Pl. dep. at 50; Pl. Ex. C, 2001 Performance Review.) The March 2004 evaluation was the last annual evaluation conducted on Gaigalas. (Pl. Ex. C(1).)

In August 2003, Betsy Tupper became Gaigalas' immediate supervisor, District Manager of the Grand Rapids Geo Metro team. At the end of 2003, the sales teams were restructured and Gaigalas was teamed with Charles Zickus (b. 9/22/71) and Ginger Feldman (b. 5/30/72) on the Geo Metro team. Tupper and her supervisor, Regional Manager John McKenney, implemented a new sales system, called the "Michigan Model," that was proved unproductive for the district. Chris Marfia (B. 10/23/76), a member of the Muskegon team also supervised by Tupper, described the Michigan Model as follows:

> The Michigan Model was a series of pie charts, typically three, that were generated by reps for individual offices. Essentially, all the offices we call on. They composed managed care information that we were supposed to obtain, had obtained from the various offices that we call on. And the models were used in the initial engagement with the physicians. We'd used the models right away and start our presentations based on these various pie charts that we had for that particular office.

(Marfia dep. at 28; Pl. Ex. C(4).) The model required the use of representative-generated demonstrative materials, which Gaigalas, Marfia and others concluded were both illegal and against clear company policy. (Gaigalas dep. at 55, 112; Marfia dep. at 29.) Representatives were also instructed to use illegal literature comparing drug efficacy based on separate studies. (Marfia dep. at 33-35; Gaigalas dep. at 52-53.) Tupper advised Gaigalas, Marfia and others that they were required to use the selling method and materials or be penalized. (Gaigalas dep. at 71, 98-100; Marfia dep. at 30, 45-46.)

Performance in the region dropped dramatically under Tupper's leadership. Gaigalas, however, remained the top seller in his team during every single month of 2004. (See

3

Rankings Summary, Pl. Ex. F; 2004 and 2005 Rankings, Pl. Ex. G.)  Nevertheless, Tupper began to produce field reports in which she criticized Gaigalas' performance on nearly every aspect of the core competencies for which he had been evaluated at the highest level less than a year before and based on which he had been promoted to Senior Sales Representative. (Gaigalas Field Reports, Def. Ex. 5(a)-(h).)  Gaigalas contacted Jim Luisi and Glen Englram, the president and vice-president of human resources to advise them about problems he had with Tupper's demands, abuse and counter-productive selling method, and about his worries for his job security.  (Gaigalas dep. at 62.)

In August 2004, while his less productive teammates remained in good standing, Gaigalas was placed on a 90-day Action Plan by Tupper because of his alleged failures to meet expectations in certain competencies.  (Tupper dep. at 30.)  About the same time, Tupper placed Chris Marfia of the Muskegon team on an Action Plan for failure to meet core competencies. (Tupper dep. at 33.)  In the 90 days of Gaigalas' action plan, Tupper rode with Gaigalas three times, reviewing him and finding him lacking in virtually every aspect of sales. (Gaigalas dep. at 117.)  In contrast, Tupper never rode with Marfia during his Action Plan, relying instead on verbal reports from Marfia himself.  Marfia was taken off the plan in September, before the Action Plan expired. (Marfia dep. at 45.)  Tupper was unable to explain at deposition the information she relied upon to determine that Marfia had sufficiently improved his performance to be taken off the plan.  (Tupper dep. at 33.)

4

In September 2004, John McKenney, Tupper's supervisor, rode with Gaigalas. Gaigalas spoke with McKenney about his recent bad field reports. Gaigalas and McKenney discussed the Michigan Model, which McKenney had been instrumental in implementing. McKenney asked Gaigalas, "Why are the older guys having a problem with the sales model?" (Gaigalas dep. at 111-12.) Gaigalas reported the strong feeling that he no longer "fit the mold" as a BIPI representative as far as Tupper and McKenney were concerned. (Gaigalas dep. at 110, 117.) In November 2004, Gaigalas was placed on a "Performance Plan," despite the fact he continued to out-perform his teammates in the President's Club rankings. (Rankings Documents, Ex. F and G.) The plan chastised Gaigalas for lack of product knowledge, ineffective sales, problems with teamwork and profitability. (Def. Ex. 5(h).) Gaigalas testified that he followed the Performance Plan as far as possible. (Gaigalas dep. at 148.) He continued to inquire with Luisi and Englram about the untrue field reports and he reported that Luisi seemed to take his complaints seriously. (Gaigalas dep. at 58-59, 144, 146.)

Marfia asked Tupper who had approved the nonconforming literature. Tupper advised that McKenney had approved the material, but she did not indicate that the marketing and legal departments had approved it. Marfia contacted the legal department and faxed copies of the charts to them. (Marfia dep. at 32.) In approximately September 2004, Gaigalas spoke with Glen Englram and Jim Luisi about Michigan Model and the materials being used. (Gaigalas dep. at 101.) Shortly after Marfia's and Gaigalas' contacts, all sales

representatives in the district were instructed by McKenney to discontinue use of the Michigan Model and destroy all documents related to the model. (Gaigalas dep. at 101-02; Pl. Ex. I.)

Tupper was transferred from her sales manager position and assigned to a position in managed care beginning January 2005. (Tupper 8, 26.) John McKenney also left his management position in early 2005 (Gaigalas dep. at 158-59.) Bruce White took over Tupper's position in January 2005, transferring from the Kalamazoo District to the Grand Rapids Geo Metro District. (White dep. at 13.) By January 2005, after Tupper left her supervisory position, the Geo Metro Team had risen to third of 21 teams in the region in sales performance. (Pl. Ex. G.)

At the end of 2004, Rachel Clementi (b. 5/12/74) was hired into the Grand Rapids GEO metro team. The district grew from three team members to four team members, and it was re-divided into four sections.

Gaigalas was finally able to speak in person to Luisi at a January 2005 meeting. Gaigalas informed Luisi that he believed his job was in jeopardy. He discussed his past issues with Tupper and McKenney's comments about "old guys." Luisi told Gagailas that he would not be fired. (Gaigalas dep. at 116-17.) Marfia was a participant in the conversation and corroborates Gaigalas' testimony. (Marfia dep. at 60.)

The new District Manager, Larry Bruce White, continued to implement the Performance Plan imposed by Tupper. The 60-day period expired on January 12, 2005.

6

According to White, after discussions with Glen Englram, he instituted a 30-day extension of the 60-day Performance Improvement Plan on February 1, 2005. (White dep. at 41-42.) Gaigalas, however, testified that he was never informed that his Performance Improvement Plan had been extended and the document was not included in his employment file when he obtained it after his termination. (Gaigalas dep. at 156-57, 189.) White accompanied Gaigalas on three field evaluation trips on January 19, February 22, and February 24, 2005 and made three field contact reports, and his evaluative remarks substantially tracked comments made by Tupper in her earlier reports. (Gaigalas Response to 1/19/07 Field Contact, Pl. Ex. J.) White performed three ride alongs and made two contact reports for Zickus during the same period. White did not report making a ride-along or report for Feldman during the same period. Gaigalas again worried about his job, contacting Human Resources about criticisms of his selling skills despite the fact that his team ranking had risen in January 2005 to third out of 21 teams, and his personal ranking remained the highest of his team. (Rankings Summary, Pl. Ex. F.) Gaigalas was fired on March 14, 2005.

On January 28, 2005, Jason Rambo was hired to start as part of the Grand Rapids Geo Metro team effective February 14, 2005. (Rambo Offer Letter, Pl. Ex. K.) Rambo was in sales training for several weeks and did not sell in the field until after Gaigalas was fired. Although Defendant attaches affidavits to the effect that Rambo was added to expand the team from four to five members, when Gaigalas was fired, his responsibilities were divided among the remaining four members. After Gaigalas was fired, the Metro Geo team dropped

to last place of 21 teams in the 2005 regional rankings. (Zickus Evaluation at 1, Pl. Ex. C(2); Feldman Evaluation at 1, Pl. C(3).)

Plaintiff has presented some additional evidence of age discrimination. Chris Marfia testified that during the course of Gaigalas' difficulties, company hiring, particularly by Tupper, changed significantly. Tupper hired very young people and did not hire people with experience. (Marfia dep. at 51-52.) In addition, Plaintiff has provided a list of persons placed on a performance improvement plan between 2003 and 2006. Only four people were placed on a plan, and all of those were during 2005-06. All four individuals placed on the performance improvement plan were over 40, and all of those individuals eventually were terminated. (Age Chart, Pl. Ex. B.)

## II.

On a motion for summary judgment, a court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court, however, "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th

Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.* Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim. *Celotex*, 477 U.S. at 322; *Mulhall v. Ashcroft*, 287 F.3d 543, 550 (6th Cir. 2002). A party opposing a motion for summary judgment "may not merely recite the incantation, 'credibility,' and have a trial in the hope that a jury may believe factually uncontested proof." *Fogery v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "'[D]iscredited testimony is not [normally] considered a sufficient basis'" for defeating the motion. *Anderson*, 477 U.S. at 256-57 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more

persuasive evidence demonstrating a genuine issue for trial. *Celotex*, 477 U.S. at 323-24; *Matsushita*, 475 U.S. at 586-87; *Street*, 886 F.2d at 1480. "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).

### III.

The standards of proof under the ADEA and the ELCRA are materially identical. *See Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 800 (6th Cir. 2007) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)). The Court therefore will discuss both claims under the applicable federal precedent. *Id.*

In order to establish a prima facie case of age discrimination in termination using circumstantial evidence, the plaintiff must show four elements: (1) the employee was in a protected group; (2) the employee was qualified for the position; (3) the employee was terminated; and (4) a comparable, non-protected person was treated better or the employee was replaced by a person not in the protected class. *Stockman*, 480 F.3d at 801-02 (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* Once the defendant has proffered such a justification, "while an inference of discrimination may still be drawn

from the prima facie evidence, the mandatory presumption of discrimination drops from the case." *Id.* at 802 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)). The burden shifts back to the employee to prove by a preponderance of the evidence that the legitimate reasons proffered by the defendant were a pretext for discrimination. *Id.*

In its motion for summary judgment, Defendant argues that Plaintiff has failed to establish a prima facie case of discrimination because he has failed to satisfy the fourth prong of the test by showing that a substantially younger person was treated more favorably or that Plaintiff was replaced by a substantially younger person. Defendant further contends that, assuming that Plaintiff could demonstrate a prima facie case, Plaintiff has failed to demonstrate a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reason for the discharge was pretextual.

    A.    <u>Hiring of substantially younger person</u>

Defendant argues that Plaintiff cannot demonstrate that he was replaced by someone substantially younger than himself because Jason Rambo was hired on January 28, 2005, more than a month before Gaigalas was terminated. Defendant contends that it is uncontested that Rambo was hired during an expansion of the sales district from four to five people. (White dep. at 52, 54.) It further asserts that Plaintiff offers nothing but his conclusory allegations that Rambo was given Gaigalas' company car, locker and territory. It therefore argues that Plaintiff has failed to contradict Defendant's articulated reason for hiring Rambo – to fill a newly created position.

11

Defendant's contention ignores the evidence presented by its own witnesses. Rambo was hired little more than a month before Gaigalas was terminated, at the same time Gaigalas' Performance Improvement Plan apparently was extended for thirty days. (White dep. at 55.) According to the testimony of Larry Bruce White, the manager of the Grand Rapids Geo Team at that time, Rambo was doing home training for more than a month before being assigned a car, locker and territory. (White dep. at 55-56.) He did not receive those assignments until after Gaigalas was fired, and, according to White's testimony, Rambo was given both Gaigalas' car and locker. (White dep. at 56.) According to the President's Club rankings reports, after Gaigalas was fired, only four salespeople were assigned to the Geo Metro area. (Pl. Ex. G, May 16, 2005 report.)

Defendant argues that, under Sixth Circuit precedent, "[s]preading the duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). It therefore contends that, because the Gaigalas' duties were simply absorbed by the four remaining salespeople, Gaigalas cannot demonstrate discrimination. By White's testimony, however, before Gaigalas was terminated, Rambo was not calling on any accounts in any territory of his own. (White dep. at 56.) Indeed, according to White, the reason Rambo was not given a car until after Gaigalas' termination was that Rambo did not need a car until he had completed his home study. (White dep. at 56.)

12

In other words, while Rambo technically was hired before Gaigalas was terminated, he was not actively selling in the region until after Gaigalas was fired. And, although White testified that Rambo was hired for a new position, once Gaigalas was fired, no new employee was added to the group. Given that Gaigalas had been on a performance improvement plan that White had just extended for 30 days at the time Rambo was hired, there exists a genuine issue for the trier of fact as to whether Rambo was hired as a replacement in anticipation of Gaigalas' ultimate termination. Moreover, according to Gaigalas, he was never informed by White that his performance improvement plan had been extended. The evidence and reasonable inferences from that evidence are sufficient to support the fourth element of Plaintiff's prima facie case of discrimination.

B.   Pretext

Defendant has articulated a legitimate, nondiscriminatory reason for Gaigalas' termination: he was unacceptable and did not meet the expectations of the Company on all core competencies. Poor performance is a legitimate, nondiscriminatory reason for discharging an employee. *Stockman*, 480 F.3d 791, 802 (6th Cir. 2007). The burden therefore moves to Plaintiff to demonstrate that Defendant's proffered reason was pretextual.

In order to demonstrate that the defendant's reason is pretextual, a plaintiff must produce sufficient evidence from which the jury could conclude either that a discriminatory motive more likely motivated the employer or that the employer's explanation is not credible. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002). A factfinder's disbelief of a

13

defendant's nondiscriminatory explanation for the discharge may, together with the elements of the prima facie case, be sufficient for a jury to find intentional discrimination and no additional proof of discrimination is required. *Manzer*, 29 F.3d at 1083. However, a jury may only reject an employer's explanation if "there is a sufficient basis *in the evidence* for doing so." *Id.*

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

*Manzer*, 29 F.3d at 1084 (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)) (emphasis omitted)).

The first type of showing consists of evidence that the proffered bases for the discharge never occurred. *Manzer*, 29 F.3d at 1084. The third type of showing consists of evidence that other employees, particularly those outside the protected class, "were not fired even though they engaged in substantially identical conduct . . . ." *Id.* Both the first and third types of showings amount to "direct attacks on the credibility of the employer's motivation for firing plaintiff [which], if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)); *see also Peters*, 285 F.3d at 472.

The second type of showing, in contrast, admits the factual basis underlying the employer's proffered motivation for firing and admits such conduct could motivate dismissal.

*Manzer*, 29 F.3d at 1084.  However, the plaintiff attacks the credibility of the explanation by showing circumstances that tend to prove that illegal discrimination was the more likely reason for the discharge.  This second type of showing requires more than the simple evidence supporting the prima facie case. *Id.*

Here, Plaintiff attacks Defendant's motivation for the firing in both the first and the third ways.  With respect to the first type of showing, Plaintiff asserts that the explanation for his discharge was manufactured by unfair and unreasonable criticism of performance criteria that falsely portrayed his performance and completely disregarded the significance of his actual sales, which remained the highest in his sales team during the entire period of his discipline.  While acknowledging that other performance criteria were evaluated by the company, Plaintiff contends that compensation was based strictly on sales. (Gaigalas dep. at 33-34, 191-92; Marfia dep. at 25-26.)  Plaintiff also provides evidence that he was criticized by his new supervisor for lack of product knowledge when, a few months before the criticism, he had been used to train other sales representatives because of his product knowledge, and had been promoted to senior sales representative in 2003 because of his high level of skill on all performance factors.  Moreover, in the last full performance evaluation before Tupper began to criticize him during ride-alongs (March 2004), Gaigalas was rated as meeting or exceeding expectations in most of the areas Tupper began to criticize a month later.  (Pl. Ex. C(1).)  Gaigalas was never given a performance evaluation on core competencies in 2004.

15

On the third prong, Plaintiff has identified at least one other employee, Chris Marfia, who was placed on a 90-day Action Plan by Tupper at about the same time as Gaigalas because of his alleged failures to meet expectations in certain core competencies. (Tupper dep. at 33.) In the 90 days of Gaigalas' Action Plan, Tupper rode with Gaigalas three times, reviewing him and finding him lacking in virtually every aspect of sales, which, during his evaluation only three months before, Gaigalas had been found to meet or exceed expectations. (Gaigalas dep. at 117.) Tupper, however, never rode with Marfia during the entire period of his Action Plan, relying instead on verbal reports from Marfia himself. Marfia was taken off the plan in September, before the Action Plan expired. (Marfia dep. at 45.) Tupper was unable to explain at deposition the information she relied upon to determine that Marfia had sufficiently improved his performance to be taken off the plan. (Tupper dep. at 33.) Because of the different treatment, Marfia was never placed on a performance improvement plan that eventually resulted in Gaigalas' discharge.[1]

The evidence indicates that Gaigalas was subjected to ride-alongs with Tupper at somewhat greater frequency than other employees on his team, with more resulting reports. (Def. Ex. 5.) In addition, from one field contact report in April 2004 to the next contact in June 2004, Gaigalas went from having strong ratings in most areas to weak ratings, even on

---

[1] While Gaigalas technically was fired by White, Tupper supervised him and evaluated him until January 2005, just before the end of his Performance Improvement Plan and just before Rambo was hired. Tupper's history of negative evaluations, during which Tupper arguably treated Plaintiff differently than Marfia and other sales representatives, formed the basis for White's final review and discharge of Plaintiff.

skills such as product knowledge, which presumably would not suddenly decrease. In April, he was told he had "very strong product knowledge," while in June he had only "fairly good understanding of BI products" and was not meeting expectations in product knowledge. (Def. Ex. 5(A),(B); Gaigalas dep. at 108.)  In another field report, information other than product knowledge was criticized to form the basis of a "not meeting expectations" score. (Def. Ex. 5(C).  Similarly, having previously been recognized for his teamwork, Gaigalas was suddenly described as a poor team player based on arguably minor criticisms.  Further, he was evaluated as not meeting expectations on sales and profitability during the time his numbers were consistently higher than all others on his team, who received either "meeting expectations" or "partially meeting expectations" ratings or were not evaluated at all on this variable.  (Compare Def. Ex. 5(D), (F) with Def. Ex. 5(J), (L), (M), (N), (O), (P), (Q), (S).) Further, in the three ride-alongs with White, Gaigalas was consistently given "not meeting expectations" for sales based on a report for the month of October 2004, a comparison that was never updated and during which he always led his team members.  During the same period, Zickus was evaluated on more current data and Feldman was not evaluated at all. (Compare Def. Ex. (6)(A), (B), (C) with Def. Ex. (6)(F), (G).)

      Finally, Gaigalas has provided some evidence of age-related comments that tend to reinforce his prima facie case of discrimination.  First, at the time Tupper and McKenney began demanding sales people use the Michigan Model, Gaigalas evaluated harshly for not incorporating the problematic model.  McKenney asked Gaigalas, "Why are the older guys

17

having a problem with the sales model?" (Gaigalas dep. at 111-12.)  In addition, according to the testimony of Chris Marfia, Tupper and the company began hiring only young people, without significant experience in the industry.  (Marfia dep. at 51-52.)  That testimony appears to be at least arguably corroborated by Defendant's answer to Plaintiff's first interrogatory.  (Pl. Ex. B.)  Finally, a summary of the hiring data contained in the response to Plaintiff's first interrogatory indicates that all four people placed on a performance improvement plan were members of the protected group.  (Pl. Ex. B.)

Taken together, Plaintiff has introduced sufficient evidence that, if believed, would permit a jury to find that Defendant's proffered explanation for his discharge was pretextual and that the real reason was discrimination.

## IV.

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment.  An order consistent with this opinion shall be entered.


Date:     August 24, 2007           /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE